**UTICA MUTUAL INSURANCE COMPANY, Plaintiff-Appellant, Cross Appellee,**

v.

**FIREMAN'S FUND INSURANCE COMPANIES, Defendant-Appellee, Third Party Plaintiff, Cross Appellant,**

**Phillip Turner, Hoffman Kavanaugh Securities Corporation and Lon Roy Kavanaugh, Jr., Third Party Defendants-Appellees.**

**Nos. 207, 345, Dockets 84-7506, 84-7538.**

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1984.

Decided Nov. 16, 1984.

Roger J. Hawke, New York City (Paul Windels, III, Brown, Wood, Ivey, Mitchell & Petty, New York City, of counsel), for plaintiff-appellant, cross appellee.

Jerome Murray, New York City (Robert Wang, Robert G. Post, Hendler & Murray, P.C., New York City, of counsel), for defendant-appellee and third-party plaintiff, cross appellant.

Scott D. Heller, New York City (Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), Catherine A. Ludden, New York City (Martin P. Unger, Gaston, Snow, Beekman & Bogue, New York City, of counsel), for third-party defendants-appellees.

Before KAUFMAN and WINTER, Circuit Judges, and TENNEY, Senior District Judge.*

TENNEY, Senior District Judge:

In this diversity suit, Utica Mutual Insurance Company ("Utica") appeals from a judgment of the United States District Court for the Southern District of New York, Morris E. Lasker, *District Judge,* dismissing Utica's complaint against Fireman's Fund Insurance Companies ("Fireman's Fund") to recover payment under a fidelity bond issued by Fireman's Fund. Following trial, the court, sitting without a jury, held that Utica was barred from recovery because it had failed to comply with the notice provisions set forth in the fidelity bond. We hold that the district court was clearly correct.

---

\* Of the Southern District of New York, sitting by designation.

In addition, Fireman's Fund appeals the dismissal of its claim for indemnity against the third-party defendant, Lon Roy Kavanaugh, Jr. ("Kavanaugh"). It is not necessary to address this appeal since the claim for indemnification is predicated on Fireman's Fund's being held liable to Utica under the fidelity bond.

Finally, Kavanaugh argues that the appeal by Fireman's Fund discussed above is frivolous and that he should be awarded costs and fees incurred defending the appeal. We find that the appeal is not frivolous and therefore decline to award costs and fees to Kavanaugh.

## Background

The undisputed facts establish that the following events occurred. In 1976, Utica resolved to make certain changes in its investment portfolio. Utica planned to sell certain tax-exempt bonds and replace them with corporate securities that would yield a higher return. It was agreed, however, that this conversion would take place only if it could be accomplished without loss.

From 1976 to 1979, Utica's investment manager, Philip Turner ("Turner"), sold a large number of Utica's tax-exempt bonds at prices substantially above the market rate and then purchased taxable bonds of equal value at prices that were also above the market rate. Kavanaugh acted as the broker-dealer in all of these transactions and received $802,000 in commissions. Kavanaugh set up his own company, Hoffman Kavanaugh Securities Corporation ("HKS"), in order to conduct these transactions, which are commonly known as "adjusted trading" or "overtrading." Utica was the only active account handled by HKS.[1] Utica's claim under the fidelity bond—which covered losses resulting from employee misconduct—pertains solely to the commissions paid to Kavanaugh as a result of the adjusted trading.

The bond transactions in question first came to light in December of 1978, when a new employee at Utica reviewed Utica's bond portfolio and found that a substantial number of taxable bonds had been purchased at prices that were considerably higher than the market rate. The chairman of Utica, Victor Ehre ("Ehre"), was immediately advised of the problem. On January 12, 1979, the president of Utica, Jack Riffle ("Riffle"), was also advised that certain irregularities in the bond portfolio had been uncovered and, on January 24th, Ehre and Riffle met with Turner to discuss the matter. An investigation was initiated and, by the end of February, employees in Utica's investment department had spent at least 250 hours examining the transactions in question. At the end of February, Turner was relieved of all duties at Utica and he subsequently elected to take early retirement.

On February 22nd, Utica's Audit and Finance Committee met to discuss the problem. Ehre prepared a memorandum for that meeting outlining the facts that were known about the adjusted trading. In his memorandum, Ehre stated that (1) bonds had been purchased at above market rates, (2) such purchases violated IRS rules, (3) Utica was faced with certain tax problems because of the adjusted trading, and (4) excess commissions had been paid to the broker. The district court found that—in light of these facts—Utica knew, or should have known, by February 22nd, that there had been misconduct resulting in a loss.

Between February 22nd and July 23rd, when notice was ultimately given to Fireman's Fund, Utica continued to investigate the adjusted trading. In May, Utica received a financial report from the accounting firm of Arthur Andersen & Co. stating that there had in fact been a loss—namely the money paid to Kavanaugh as commissions. In June, Utica was advised by outside counsel that adjusted trading was illegal. In July a second attorney confirmed

---

**1.** HKS is no longer in operation. Fireman's Fund impleaded Turner, Kavanaugh and HKS as third-party defendants in this action. After a six day bench trial, the district court found that Fireman's Fund had failed to meet its burden of proof and dismissed its claims against Kavanaugh and HKS.

the prior opinion. The trial court found that no new material facts concerning the loss were uncovered between February and July.

On July 23rd, Utica submitted its notice of loss to Fireman's Fund, claiming that Turner had committed dishonest or fraudulent acts within the meaning of the bond, by engaging in a series of fraudulent and illegal securities transactions, and that Utica had sustained a loss of $802,000 as a result of those transactions.

It is undisputed that, under the terms of the bond, Utica was required to give notice of any loss "as soon as practicable" after· discovery of the loss. The trial court found that by February 22, 1979, Utica had enough information to have reasonably determined that a loss had occurred as a result of Turner's misconduct and that the notice requirement was therefore triggered at that time. Because Utica failed to give notice to Fireman's Fund until July 23, 1979—six months later—the trial court held that Utica had failed to comply with the notice provisions set forth in the bond; the court therefore dismissed Utica's complaint against Fireman's Fund.[2]

On appeal, Utica argues that the district court erred—both legally and factually—in finding that by February 22nd Utica's knowledge of the facts constituted discovery. We reject Utica's arguments and affirm the district court's decision.

## DISCUSSION

### I. *Utica's Appeal*

■ Compliance with the notice requirements set forth in an insurance contract is a condition precedent to recovery under New York law, and failure by the insured to comply with such requirements relieves the insurer of liability. *See Gardner-Denver Co. v. Dic-Underhill Constr. Co.*, 416 F.Supp. 934, 936 (S.D.N.Y.1976) (citing *Security Mut. Ins. Co. v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 440, 340 N.Y.S.2d 902, 905, 293 N.E.2d 76, 79 (1972)).

■ An insurance company is entitled to require notice at the earliest time practicable after a loss has occurred. Prompt notice permits the insurer to investigate the facts on which the claim is predicated and to adjust its books in order to maintain a proper reserve fund in light of the insured's claim. New York law permits an insurance company to assert the defense of non-compliance without showing that the lack of timely notice prejudiced the insurer in any way. *Id.*

The fidelity bond involved in this case required Utica to notify Fireman's Fund of any loss "as soon as practicable," which simply means that notice had to be given within a reasonable time of the discovery of loss. *See Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 19, 416 N.Y.S.2d 559, 563, 389 N.E.2d 1080, 1084 (1979). Whether Utica complied with the notice provisions, therefore, depends on when Utica *discovered* that there had been misconduct resulting in a loss.

Utica argues that the district court erred, legally and factually, in determining when the loss was discovered because the court failed to give adequate consideration to Utica's subjective conclusions concerning the known facts.

The court below held that Utica had discovered the loss by February 22, 1979, because, by that date, Utica's officers "were in full possession of the information necessary for them to have determined that a loss had occurred." Utica principally contends that—although it knew the material facts concerning the adjusted trading by February—Utica did not discover the loss, as a matter of law, until July 1979 because (1) it maintained a good faith and reasonable belief in Turner's honesty until July, and (2) it did not recognize the significance of the facts until that date.

■ Courts have consistently held that a loss is discovered once an insured has obtained facts that would cause a reasonable

---

2. The third-party claim made by Fireman's Fund against Turner, seeking indemnification, was also dismissed when the district court dismissed Utica's complaint.

person to recognize that there had been dishonesty or fraud resulting in loss. *See, e.g., American Sur. Co. v. Pauly,* 170 U.S. 133, 147, 18 S.Ct. 552, 557, 42 L.Ed. 977 (1898); *Fidelity & Deposit Co. v. Hudson United Bank,* 653 F.2d 766, 774 (3d Cir. 1981); *Perkins v. Clinton State Bank,* 593 F.2d 327, 334–35 (8th Cir.1979); *Hidden Splendor Mining Co. v. General Ins. Co.,* 370 F.2d 515, 517 (10th Cir.1966). New York law, which governs in this case, also requires that the time of discovery be determined according to an objective test, based on the conclusions that a reasonable person would draw from the facts known to the insured. *See Security Mut. Ins.,* 31 N.Y.2d at 441–43, 340 N.Y.S.2d at 906–07, 293 N.E.2d at 78–90.

The district court applied this legal standard in finding that by February 22nd Utica's officers had "the information necessary for them to have determined that a loss had occurred." The court's holding implicitly incorporates the objective legal standard since it is based on what Utica's officers reasonably could or should have concluded.

■ The question, therefore, is not whether the district court applied the correct legal standard—which it did—but, rather, whether the legal standard was applied correctly. Utica argues that the court erred in its application of the law to the facts because it failed to give adequate consideration to the subjective conclusions drawn by Utica in light of the known facts—conclusions that Utica asserts were reasonable.[3]

First, Utica argues that, until July, it maintained a reasonable and good faith belief in Turner's honesty. Utica's good faith defense, however, is vitiated by its knowledge of the facts and its duty to inquire.

The unusual nature of adjusted trading in this case, together with Turner's furtive and unauthorized conduct, was sufficient to have alerted a reasonable person to the fact that there may have been dishonesty or fraud. Although Turner asserted that the transactions in question would result in "a wash"—so that there would be no profit or loss—the February 22nd memorandum, prepared by the chairman of Utica, showed that Utica believed that the transactions did not wash. The memo stated:

> If all of the transactions washed—or were completely offsetting—there would be no problem. It appears that they do not wash to the effect that there is excess commission to the broker.

Utica's good faith belief in Turner's honesty was unreasonable in light of the information Utica had acquired by February.

Further, although Utica asserts that it was justified in believing in Turner's honesty until July when it was advised by outside counsel that adjusted trading was actually illegal, New York law imposes a duty of inquiry on the insured. *See Security Mut. Ins.,* 31 N.Y.2d at 441, 340 N.Y. S.2d at 906, 293 N.E.2d at 78; *Blackman v. American Home Assurance Co.,* 58 A.D.2d 723, 724, 396 N.Y.S.2d 291, 293 (3d Dep't 1977). If Utica was uncertain of the legality of Turner's conduct, then Utica should have promptly obtained legal advice as part of its general inquiry into the transactions in question.[4]

**3.** Our review of the district court's application of the law to the facts in this case is not limited to the clearly erroneous standard; plenary review is appropriate here. *See United States Fidelity & Guar. Co. v. Royal Nat'l Bank,* 545 F.2d 1330, 1333 (2d Cir.1976) (citing *In re Hygrade Envelope Corp.,* 366 F.2d 584, 587–88 (2d Cir. 1966)).

In determining whether a party has a reasonable belief, the trial court must first determine what facts the party knew and, then, must determine the legal consequences of the known facts. "[W]hen the issue is [the court's] application of a legal standard to facts undisputed or reason-

ably found, reversal is not limited to results that are 'clearly erroneous'; it is enough that the appellate court should be convinced ... that the result does not jibe with the applicable rule of law." *Hygrade Envelope,* 366 F.2d at 588.

**4.** Notice of loss cannot be delayed because of failure to obtain legal counsel. *See Pawtucket Mut. Ins. Co. v. Dolby,* 305 F.Supp. 703, 706 (D.Mass.1969) (The court held that "[d]oubt about coverage" does not affect the date of discovery if the insured is cognizant of the facts underlying the loss.).

Further, an insured may not avoid giving notice during the period that the exact amount of

Second, Utica argues that it was not required to give notice of loss based solely on a hunch or intuitive feeling that there had been misconduct. Utica contends that the facts it had acquired by February caused it to merely *suspect* that Turner may have acted in a dishonest or fraudulent manner, and to *surmise* that a loss may have resulted. Utica asserts, however, that such suspicions were not sufficient to require notice.

■ Although Utica is correct that mere suspicions do not trigger the notice requirement, an insured cannot disregard the known facts.[5] "[W]hen the insured learns the facts constituting the alleged dishonesty his prior suspicions, if any, are converted to knowledge which he cannot ignore and which constitutes 'discovery.'" *Perkins*, 593 F.2d at 335 (quoting *Alfalfa Elec. Coop. Inc. v. Travelers Indem. Co.*, 376 F.Supp. 901, 906 (W.D.Okla.1973)).

The district court determined the legal consequences of the known facts correctly: although the initial exposure of irregularities in Utica's bond portfolio—in December 1978—may have given rise to mere suspicions, once Utica knew the facts upon which this claim is predicated—by the end of February 1979—Utica's suspicions were transformed into knowledge constituting discovery.[6]

The record thus indicates that, contrary to Utica's argument, the court did give adequate consideration to Utica's subjective conclusions, but rejected them as unreasonable in light of the known facts and the insured's duty of inquiry.

Adopting Utica's arguments concerning when a loss is discovered would broaden the definition of discovery and would effectively eliminate the insured's duty to inquire into the facts. It would permit the insured to avoid making a reasonable assessment of the information presented, and would undermine the ability of the insurer to make a timely investigation and adjust its reserve funds.

We agree with the district court's holding that Utica had sufficient facts by the end of February to have determined that

---

the loss is established or the details are clarified. *See Public Warehouse of Matanzas v. Fidelity & Deposit Co.*, 77 F.2d 831, 832–33 (2d Cir.), *cert. denied*, 296 U.S. 633, 56 S.Ct. 156, 80 L.Ed. 450 (1935); *United States Shipping Bd. Merchant Fleet Corp. v. Aetna Casualty & Sur. Co.*, 98 F.2d 238, 243 (D.C.Cir.1938).

5. In *USLife Sav. and Loan Assoc. v. National Sur. Corp.*, 115 Cal.App.3d 336, 344-45, 171 Cal. Rptr. 393, 398 (Ct.App.1981), the insured's argument was similar to Utica's. The insured argued that although it knew all of the facts concerning its employee's fraudulent conduct, it did not have to give notice on the mere suspicion of wrongdoing. The court rejected the insured's argument, stating:

USLIFE [—the insured—] cites authority for the proposition that an employer need not file a claim under a fidelity bond until possessed of sufficient information to assure that some specific fraudulent or dishonest conduct was in fact engaged in. However, those cases stand for the proposition that an employer need not act on a hunch or suspicion, but may wait until there are concrete facts from which to conclude that liability exists under a bond. USLIFE is in the opposite position. USLIFE had all of the facts at its disposal, but contends that it need not have acted until it later

acquired the suspicion that bond coverage applied. The law requires that the employer give notice to the bonding company as soon as possible after discovery of fraudulent acts. *Id.* at 344, 171 Cal.Rptr. at 398 (citations omitted). *See also Hidden Splendor*, 370 F.2d at 518–19 (rejecting the insured's argument that discovery had not occurred because the insured had only suspicions of fraud).

6. On appeal, Utica also argues—apparently for the first time—that it could not give Fireman's Fund notice concerning Turner's conduct and the possibility of a loss without being exposed to a charge of libel or slander. Under New York law, however, a qualified privilege is granted for communications made in the discharge of a public or private duty. *See Greenfield v. Kanwit*, 546 F.Supp. 220, 227 (S.D.N.Y.), *aff'd mem.*, 714 F.2d 113 (2d Cir.1982). In this case, Utica had an obligation to give Fireman's Fund notice of employee misconduct in order to obtain the benefit of its bargain made under the contract. Such a communication would be privileged and no action for libel or slander could be maintained. "While such privilege is not absolute, it may be overcome only by a showing that the publication was motivated or actuated by actual malice." *Id.* In the instant case, giving notice required by the insurance contract would not have constituted "actual malice."

there had been a loss, and hereby affirm the court's decision.

## II. *Kavanaugh's Claim on Appeal*

Kavanaugh argues that the appeal brought by Fireman's Fund—concerning the dismissal of its claim for indemnity against Kavanaugh—is frivolous, and that under Fed.R.App.P. 38 ("Rule 38"), he should be awarded expenses and attorneys' fees incurred in opposing the appeal.[7]

Fees have been awarded under Rule 38 where the appeal was "absolutely without merit" and was an attempt to avoid certain obligations, *see Brady v. Chemical Constr. Corp.*, 740 F.2d 195, 202 (2d Cir.1984), or where the claims were "far-fetched" and the appeal was simply a calculated delay. *See Oscar Gruss & Son. v. Lumbermens Mut. Casualty Co.*, 422 F.2d 1278, 1283 (2d Cir.1970).

■ Fireman's Fund's claim for indemnity against Kavanaugh was based on Utica's allegations that it had sustained a loss as a result of Turner's dealings with Kavanaugh. Fireman's Fund's claims—and therefore its appeal of the dismissal of those claims—cannot be characterized as being completely without merit and the appeal obviously did not involve an attempt to avoid financial obligations since Fireman's Fund had no such obligations. Fireman's Fund's appeal was not frivolous; Kavanaugh, therefore, is not entitled to an award of fees or costs.

### CONCLUSION

For the foregoing reasons, we affirm the district court's decision dismissing Utica's complaint. We do not address the appeal brought by Fireman's Fund, since the question of indemnity is moot, and we decline to award Kavanaugh costs and expenses incurred on appeal.

Affirmed.

---

**7.** Fireman's Fund appealed the dismissal of its claim for indemnity against Kavanaugh in order to protect its rights in case the district court's decision was reversed. This appeal has not been addressed since we have affirmed the district court's decision that Fireman's Fund is not liable to Utica under the bond.